ANGEL LOPEZ,

       Petitioner,

v.

JULIE L. JONES,
Secretary, Florida Department of Corrections,

       Respondent.

_____/

## ORDER ON MOTION TO VACATE JUDGMENT AND SENTENCE

**THIS CAUSE** is before the Court upon Petitioner Angel Lopez's ("Petitioner") Petition to Vacate Judgment and Sentence pursuant to 28 U.S.C. § 2254, ECF No. [1] (the "Petition"), challenging his judgment and conviction entered in the Seventeenth Judicial Circuit Court in Broward County, Florida. The Court has carefully considered the Petition, all supporting and opposing filings, the relevant authority, and is otherwise duly advised in the premises. Because the Petition can be resolved on the basis of the record, an evidentiary hearing is not warranted. *See Schriro v. Landrigan*, 550 U.S. 465, 473-474 (2007) (explaining that if the record refutes the factual allegations in the habeas petition or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing). For the reasons that follow, the Petition is denied.

## I.  BACKGROUND

This case stems from an incident that took place during the late night hours of October 7, 2006, and into the early morning hours of October 8, 2006. At around 11:30 p.m. on October 7, 2006, Petitioner and a group of his friends and family were gathered in the parking lot of an arcade known as "Boomers." The group was getting ready to leave the arcade when they were

confronted by a group of several young men, one of whom was Yahtavian Bellamy ("Bellamy"). Bellamy and his group were in two separate vehicles—a silver Mitsubishi and a green Buick. This confrontation apparently stemmed from an earlier encounter that took place between Petitioner and one of the individuals in Bellamy's group. During the confrontation, Bellamy's group circled Petitioner's group in their two vehicles, and at least one of the vehicles swerved close to Petitioner's group. Additionally, individuals in both vehicles made insinuations to Petitioner's group that they were carrying weapons.

Bellamy's group eventually left the parking lot area in their two vehicles along a two-lane road adjacent to the parking lot. Shortly thereafter, Petitioner's group left the parking lot area—also in two vehicles—along the same road. Another confrontation between the two groups then ensued. Individuals in Petitioner's group, traveling in a black SUV, passed both the Mitsubishi and the Buick, which was being driven by Bellamy, by driving over the grass on the side of the road. Petitioner, driving alone in a black Chevrolet Monte Carlo, was following the black SUV a short distance behind. At this point, Petitioner and Bellamy took turns swerving in front of one another with their respective vehicles. The confrontation finally came to an end when Petitioner, as Bellamy's vehicle slowed down or came to a stop in front of him, pulled up next to Bellamy in the left lane (heading in the wrong direction of travel), rolled down his passenger-side window, and fired a weapon he was carrying at the time thirteen to fourteen times at Bellamy's vehicle, hitting Bellamy in both of his legs.[1] Petitioner then drove off as Bellamy pulled over to the side of the road and fell out of his vehicle. Soon thereafter, Petitioner was arrested a short distance away by a police officer responding to the incident.

Petitioner was subsequently charged by information with aggravated battery with a firearm (Count I) and discharging a firearm from a vehicle (Count II) in case number 06-cf-

---

[1] Bellamy suffered two gunshot wounds in each leg.

17913. ECF No. [1-2] at 3. A jury found Petitioner guilty on both counts. *Id.* at 5. In accordance with the verdict, the trial court judge sentenced Petitioner to twenty years imprisonment on Count I and five years imprisonment on Count II, running consecutive to the sentence imposed on Count I, for a total sentence of twenty-five years imprisonment. *See id.* at 7-12.

Petitioner, through counsel, pursued a direct appeal raising three grounds for relief: (1) the trial court erred in denying defense counsel's request to use a peremptory challenge on a black juror; (2) the trial court erred in allowing the victim to display his injuries to the jury over the defense's objection; and (3) reversal for an evidentiary hearing on ineffective assistance of counsel was warranted. *See id.* at 14-53. Upon review, the appellate court affirmed, rejecting the first two grounds without discussion and denying the third ground on the basis that, on direct appeal, the ineffective assistance of counsel claim was not properly raised. *Id.* at 55-56.

Petitioner then filed a motion for post-conviction relief pursuant to Florida Rule of Criminal Procedure 3.850, raising three claims of ineffective assistance of counsel: (1) trial counsel was ineffective for failing to appropriately convey a ten-year plea offer to Petitioner; (2) trial counsel was ineffective for "failing to develop and utilize the defense of self defense"; and (3) trial counsel was ineffective based on cumulative errors—namely, by failing to conduct meaningful voir dire, relying upon an "invalid" defense of diminished capacity, and relying upon insanity as an affirmative defense. *See id.* at 59-79. The State filed a response brief. *See id.* at 82-87. The post-conviction court summarily denied the Rule 3.850 motion, adopting the reasoning set forth in the State's response brief. *Id.* at 81.

Petitioner appealed the post-conviction court's decision. *See id.* at 104. The appellate court reversed and remanded for an evidentiary hearing on Petitioner's first claim—that trial

counsel failed to appropriately convey to him a ten-year plea offer—and affirmed without discussion the post-conviction court's decision with respect to Petitioner's second and third claims. *Id.* at 104-05. The post-conviction court held the evidentiary hearing on December 4, 2013, and thereafter denied Petitioner's first claim. *Id.* at 107.

Petitioner appealed the post-conviction court's decision, which the appellate court affirmed *per curiam* in an opinion issued on February 25, 2016. *Id.* at 109. Petitioner then filed the instant federal habeas Petition on December 1, 2016. ECF No. [1].

## II. APPLICABLE § 2254 LAW

### A. Deferential Review under AEDPA

Because Petitioner filed his Petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), this Court's review of the Petition is governed by post-AEDPA laws. *See Abdul-Kabir v. Quarterman*, 550 U.S. 233, 246 (2007); *Penry v. Johnson*, 532 U.S. 782, 792 (2001); *Davis v. Jones*, 506 F.3d 1325, 1331, n.9 (11th Cir. 2007).

Under the governing standard of review, habeas relief may not be granted with respect to a claim adjudicated on the merits in state court unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "This is a difficult to meet[] and highly deferential standard for evaluating state-court rulings, which demands that the state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks and citations

omitted); *see also Harrington v. Richter*, 562 U.S. 86, 102 (2011) (pointing out that "if [§ 2254(d)'s] standard is difficult to meet, that is because it was meant to be").

With respect to what constitutes an "adjudication on the merits," both the Supreme Court and the Eleventh Circuit employ broad interpretations. *See Childers v. Floyd*, 642 F.3d 953, 967-68 (11th Cir. 2011). For example, a state court's summary rejection of a claim, even without explanation, qualifies as an adjudication on the merits that warrants deference by a federal court. *Id.*; *see also Ferguson v. Culliver*, 527 F.3d 1144, 1146 (11th Cir. 2008).

For purposes of analyzing a state court's adjudication of a claim on the merits within the purview of "clearly established federal law," "[a] legal principle is 'clearly established' within the meaning of [§ 2254(d) only when it is embodied in a holding of [the United States Supreme] Court." *Thaler v. Haynes*, 559 U.S. 43, 47 (2010); *see also Carey v. Musladin*, 549 U.S. 70, 74 (2006) (citing *Williams v. Taylor*, 529 U.S. 362, 412 (2000)) (recognizing "[c]learly established federal law" consists of the governing legal principles, rather than the dicta, set forth in the decisions of the United States Supreme Court at the time the state court issues its decision). "A state court decision involves an unreasonable application of federal law when it identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case, or when it unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." *Ponticelli v. Sec'y, Fla. Dep't of Corr.*, 690 F.3d 1271, 1291 (11th Cir. 2012) (internal quotation marks and citations omitted). The "unreasonable application" inquiry requires a federal habeas court to conduct the two-step analysis set forth in *Harrington*: first, the habeas court determines what arguments or theories support the state court decision, and second, the habeas court must determine whether "fair

minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior" Supreme Court decision. 562 U.S. at 86 (citations omitted).

For purposes of analyzing a state court's adjudication of a claim on the merits in light of the evidence presented in the state court proceeding, whether a court errs in determining facts "is even more deferential than under a clearly erroneous standard of review." *Stephens v. Hall*, 407 F.3d 1195, 1201 (11th Cir. 2005). A habeas court presumes the findings of fact to be correct, and the petitioner bears the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

### B. Ineffective Assistance of Counsel Claims

Ineffective assistance of counsel claims are reviewed under the standards established by 28 U.S.C. § 2254(d). *Newland v. Hall*, 527 F.3d 1162, 1183 (11th Cir. 2008). Post-AEDPA, the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), remains applicable to the claims of ineffective assistance of counsel raised in this case. *See Newland*, 527 F.3d at 1184.

In *Strickland*, the Supreme Court established a two-part test to determine whether a convicted person is entitled to habeas relief on the grounds that his or her counsel rendered ineffective assistance: (1) whether counsel's representation was deficient—i.e., the representation "fell below an objective standard of reasonableness" "under prevailing professional norms"— which requires a showing that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment"; and (2) whether the deficient performance prejudiced the defendant—i.e., there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different— which "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." 466 U.S. at 688; *see also Bobby v. Van Hook*, 558 U.S.

4, 8 (2009); *Cullen*, 563 U.S. at 189. "A reasonable probability is a probability sufficient to undermine confidence in the outcome. . . . [which] requires a substantial, not just conceivable, likelihood of a different result." *Cullen*, 563 U.S. at 189 (internal quotation marks and citations omitted). "A habeas petitioner claiming ineffective assistance of counsel must carry his burden on both *Strickland* prongs, and a court need not address both prongs if the defendant has made an insufficient showing on one." *Osley v. United States*, 751 F.3d 1214, 1222 (11th Cir. 2014) (citing *Strickland*, 466 U.S. at 697, and *Johnson v. Alabama*, 256 F.3d 1156, 1176 (11th Cir. 2001)).

States may "impose whatever specific rules . . . to ensure that criminal defendants are well represented," but "the Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices." *Van Hook*, 558 U.S. at 9 (internal quotation marks and citations omitted). The petitioner bears the heavy burden to "prove, by a preponderance of the evidence, that counsel's performance was unreasonable." *Jones v. Campbell*, 436 F.3d 1285, 1293 (11th Cir. 2006). A habeas court must "judge the reasonableness of counsel's conduct on the facts of the particular case, viewed as of the time of counsel's conduct" and the judicial scrutiny applied "must be highly deferential[.]" *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000) (quoting *Strickland*, 466 U.S. at 689-90). The habeas court must adhere to a strong presumption that "counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. An attorney is not ineffective for failing to raise or preserve a meritless issue. *Ladd v. Jones*, 864 F.2d 108, 109-10 (11th Cir. 1989); *United States v. Winfield*, 960 F.2d 970, 974 (11th Cir. 1992) ("[A] lawyer's failure to preserve a meritless issue plainly cannot prejudice a client."). "To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable. But, the issue is not

what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'" *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (quoting *Burger v. Kemp*, 483 U.S. 776, 794 (1987)).

## III. DISCUSSION

The Petition raises three grounds for relief. Grounds One and Two present ineffective assistance of trial counsel claims, and Ground Three presents a due process violation claim. Respondent opposes relief on all three grounds. The Court will address each of Petitioner's claims in turn.

### A. Ground One

Petitioner claims that his trial counsel rendered ineffective assistance by failing to develop and utilize the defense of self defense, arguing that the record in his case "amply supported self defense" in light of "substantial evidence that [he] had a reasonable belief that deadly force was necessary to prevent great bodily injury to himself." ECF No. [1] at 15, 21. In support, Petitioner points to "several facts elicited by the defense [that] established that [he] acted in self defense." *Id.* at 17. Specifically, according to Petitioner, the record reflects that Bellamy, the victim, was the initial aggressor. *Id.* (citing ECF No. [5-1] at 286, 301-02).[2] The defense witnesses all testified that Bellamy and his group "swerved" the two vehicles they were in at the time very close to Petitioner and Petitioner's group while Petitioner and Petitioner's group were standing in the Boomers parking lot. *Id.* (citing ECF No. [5-1] at 642). Shortly thereafter, Bellamy's group returned to where Petitioner's group stood in the parking lot and insinuated to Petitioner's group that at least some of them had a weapon. *Id.* at 18-19 (citing ECF No. [5-1] at 578-79, 611, 643, 716). "The two cars the victim and his friends were in [then] left the parking lot of Boomers only to continue to threaten and harass [Petitioner] and his group

---

[2] The Trial Transcript, cited to by both parties, can be found in its entirety at ECF No. [5-1] at 17-1106.

by completely blocking the exit road to them." *Id.* at 19. Erica Jayska ("Jayska"), one of the defense witnesses, testified that upon attempting to exit the Boomers area in her vehicle—the black SUV—with the rest of Plaintiff's group, she was forced off the side of the exit road when Bellamy's vehicle swerved to hit her. *Id.* at 19-20 (citing ECF No. [5-1] at 612). Petitioner had been following behind Jayska alone in his vehicle and, moments after Jayska passed Bellamy's vehicle, Jayska observed in her rearview mirror Bellamy's vehicle swerving to hit Petitioner's vehicle and Petitioner having difficulty passing. *Id.* at 20 (citing ECF No. [5-1] at 615).

Petitioner further argues that defense counsel's performance was deficient not only in that defense counsel failed to develop and utilize the defense of self defense, but also in that counsel affirmatively disavowed the defense of self –defense. Rather, defense counsel presented to the jury an insanity defense that was without any support in the record. *See id.* at 23-24. In Petitioner's view, "[b]y presenting a defense that was not viable and affirmatively disavowing a defense amply supported by the record, counsel ensured that no defense would work." *Id.* at 24 (emphasis omitted).

By contrast, Respondent contends that the facts of this case are such that "this was a case that was virtually indefensible." ECF No. [5] at 18. Respondent further asserts that defense counsel considered both self defense and insanity as possible defenses, and that it was reasonable for defense counsel to pursue the insanity defense—a decision agreed to by Petitioner—which was ultimately based on the testimony of an expert witness and Petitioner himself. *See id.* at 18-19. Such a strategy, Respondent contends, "cannot be found to constitute ineffective assistance of counsel[,]" especially where "the facts [] do not support self defense[.]" *Id.* at 22-23. As such, Respondent argues that Petitioner has failed to demonstrate either deficient performance or prejudice, and that the decisions of the State courts denying Petitioner's ineffective assistance of

counsel claim were neither contrary to, nor an unreasonable application of, clearly established federal law.  *See id.* at 18, 23-24.

In denying Petitioner relief on this ineffective assistance of counsel claim, the post-conviction court adopted the reasoning set forth in the State's response brief.  *See* ECF No. [1-2] at 81-87.  The State argued in its response brief, in relevant part:

> The State would note Defendant is correct the evidence from the State and Defense witnesses did not support a case for insanity. However, the State would argue the evidence also did not present a case for self defense . . . .
>
> The transcripts reflect all of the witnesses testified the victim and his group were in their cars in close proximity to Defendant and his group. At one point, the victim may have confronted Defendant . . . . The witnesses for the Defendant claimed the victim and his group alluded to having some sort of weapon . . . . *The confrontation ended, the victim and his group departed the area in which Defendant and his group were located* and they were no longer a threat.
>
> The testimony of the witnesses further established the shooting occurred on a roadway in close proximity to the initial encounter between the groups after the victim, who was in his own vehicle, and his friend in another vehicle blocked both lanes of traffic on that road. There is no evidence Defendant had to act in self defense . . . *at the moment of the shooting*. A dispute in the testimony was whether the victim simply blocked the road or if he swerved his vehicle, which could have resulted in a collision with Defendant's vehicle. However, there is no evidence Defendant or anyone else was in harm's way . . . .
>
> Further, the State would argue the transcripts reflect Defendant agreed with the way in which counsel would present his case . . . [and that] Defendant even took the stand and testified consistently with this defense.
>
> There is no evidence of any prejudice which resulted to the outcome of Defendant's case because the defense, as presented by Defendant through his own testimony, was consistent with what counsel represented to the Court. Defendant cannot blame counsel for presenting his case in this way especially since he participated in and condoned the presentation of this evidence to the jury in this manner.

*Id.* at 84-85 (emphasis added).

The Court finds that the post-conviction court's denial of this ineffective assistance of counsel claim, and the appellate court's decision affirming that denial, did not result in a decision

that was contrary to, or that involved an unreasonable application of, the *Strickland* test. Petitioner's Petition focuses primarily on defense counsel's decision not to employ a defense of self defense. *See* ECF No. [1] at 15-25. In so doing, the Petition gives little attention to the equally important consideration of prejudice—that is, the likelihood that a presentation of a defense of self defense to the jury would have produced a different outcome. Ultimately, even if the Court were to assume that defense counsel's decision not to employ a defense of self defense at trial constituted deficient performance, Petitioner's ineffective assistance of counsel claim would still fail because Petitioner is unable to demonstrate the requisite prejudice. *See Osley*, 751 F.3d at 1222 (explaining that a habeas court need not address both *Strickland* prongs if the petitioner has made an insufficient showing on one).

At the outset, the Court notes that although Petitioner takes issue with defense counsel's choice of defense at trial, Petitioner does not argue or even suggest that that choice prevented the jury from being exposed to evidence or testimony that would support a theory of self defense. Quite the contrary, Petitioner's Petition relies heavily on a supposition that the evidence presented to the jury amply supported a theory of self defense.[3] For purposes of determining prejudice, then, the Petition essentially relies on arguments—more specifically, arguments that were not made by defense counsel—to demonstrate the reasonable probability of a different outcome. However, for the reasons explained below, the Court finds that the evidence in the record, some of which Petitioner specifically points to in attempting to demonstrate deficient performance, precludes a finding of prejudice.

---

[3] It is worth noting that the jury was instructed on self defense, and was, therefore, informed and aware of this defense when it rendered its final verdict. Additionally, as Petitioner points out, the jury was also instructed that "if the Petitioner was in a place where he had a right to be, he had no duty to retreat prior to using deadly force to defend himself against what he reasonably believed to be the victim's vehicular assault." ECF No. [8] at 12 (emphasis omitted).

Petitioner's assessment that the record in his case contained *substantial* evidence that he had a reasonable belief that deadly force was necessary to prevent great bodily injury to himself is an exaggeration. Most of the evidence Petitioner relies upon does not speak to the time of the actual shooting. Instead, the evidence concerns the interactions that took place before the shooting occurred. For example, Petitioner argues that the actions taken by Bellamy's group while the two groups were still in the Boomers parking lot—namely, the swerving of their two vehicles near Petitioner's group—"constitute attempted aggravated battery or attempted aggravated assault under Florida law." ECF No. [1] at 18. However, these actions, having taken place some time before the shooting, do not establish—as Petitioner suggests they do—that Petitioner acted in self -defense *at the time of the shooting*, when Petitioner and Bellamy were both in their respective vehicles. *See id.* at 17 (referring to these actions as one of "several facts elicited by the defense [that] established that [Petitioner] acted in self defense"). The same can be said for the insinuations made by Bellamy's group in the parking lot moments later. Though Petitioner may have held a reasonable belief that Bellamy and/or individuals in Bellamy's group possessed a weapon based on those insinuations, such a belief does not necessarily establish that Petitioner acted in self defense when he fired his weapon into Bellamy's vehicle several moments later. Overall, given the significant temporal gap between the commission of the above mentioned acts and the actual shooting—"minutes before the shooting," as recognized by Petitioner—the Court disagrees with Petitioner's contention that those acts establish that Petitioner acted in self defense at the time of the shooting.[4] *Id.* at 15.

---

[4] Petitioner asserts that consideration of the above mentioned encounters inform the reasonableness inquiry, and cites to *Wilson v. State*, 971 So. 2d 963 (Fla. 4th DCA 2008) in support. *Id.* at 17. In *Wilson*, the Florida Fourth District Court of Appeal found that the defendant's testimony that two youths nearly ran him over, emerged from their car (one of them obtaining a table leg from the trunk) and then approached him reasonably indicated to him a need for action in self defense so as to constitute a sufficient predicate to allow admission of his proposed evidence regarding three prior conflicts with the

The Court addresses the evidence presented at trial relating to the time frame of the actual shooting after the initial encounters in the parking lot. Bellamy's group apparently blocked both lanes of the two-lane exit road with their two vehicles at a distance close in proximity to the parking lot. *See id.* at 19; *see also* ECF No. [5] at 17. Jayska, one of the defense's witnesses, testified that shortly after she passed the roadblock created by Bellamy's group, she observed Bellamy swerve his vehicle in an effort to hit Petitioner's vehicle at some point during Petitioner's approach to the roadblock. *See* ECF No. [1] at 20. In the Court's view, this is essentially the only material evidence that can be considered as to arguably suggest that Petitioner acted in self- defense at the time of the shooting.[5] Problematically for Petitioner, however, the eye-witness account provided by Jayska at trial was not only lacking in critical detail—understandably so given the circumstances (including the fact that Jayska's vantage point consisted of her vehicle's rearview mirror)—but was also at odds with the eye-witness account provided by one of the State's witnesses, Deputy Scott Popick ("Deputy Popick") of the Broward Sheriff's Office. *See* ECF No. [5] at 20.

Deputy Popick, who was working a security detail at Boomers on the night of the incident and who observed the shooting from a distance of 100-150 feet, offered detailed testimony as to what he observed. That testimony, in relevant part, is as follows:

Q        Could you tell us what you observed?

---

youths in support of his self defense claim. 971 So. 2d at 965. Here, as an evidentiary matter, there is no dispute that evidence of the prior encounters between Petitioner's group and Bellamy's group was presented to the jury.

[5] Petitioner also cites to testimony offered on cross-examination by one of the State's expert witnesses, Dr. Trudy Block-Garfield, arguing that that testimony also "buttressed a claim of self defense in this case." ECF No. [1] at 20 (citing ECF No. [5-1] at 873). The Court notes, however, the nature and extent of that testimony, which were that Petitioner's stated beliefs that Bellamy's group wanted to kill him and that he was defending himself were not delusions. *See* ECF No. [5-1] at 872-73. Dr. Block-Garfield explained that these beliefs constituted "a realistic assessment of a situation, although somewhat different from his perspective than it was perhaps from everyone's perspective." *Id.* at 872.

> A       I was with two of the managers of Boomer's patrolling the parking lot and saw three cars traveling down Bryan Road towards 1st Street.  They were apparently leaving the arcade. And the middle vehicle, which was a Chevy Monte Carlo, *pulled alongside* the first vehicle, which is a Buick Park Avenue. *They slowed to about five miles an hour.* When I thought they were going to engage in just conversation, you know, where are we going to the next spot, apparently they didn't know each other and the shooting happened.
>
> Q       Did you see where the shots were being fired from?
>
> A       From the Monte Carlo, *which was traveling in the opposite lane of travel. . . . The Monte Carlo pulled into the opposite lane of travel, pulled alongside the Buick,* which was in the proper lane of travel, and it appeared the occupant of the Chevy shot through his passenger window and into the Buick.
>
> . . . .
>
> Q       When the shots were fired, was the Buick in the proper lane of travel?
>
> A       Yes, it was.
>
> Q       After the shots were fired, what happened to the three vehicles, what did you see happen?
>
> A       The Chevy pulled out, got back into the proper lane of travel, continued and made a right turn onto Southbound Bryan Road towards Sterling Road.

ECF No. [5-1] at 440-41.  Even if defense counsel had presented a defense of self defense at trial, such a defense would have had to address Deputy Popick's account.  Tellingly, despite Petitioner bearing the burden to show a reasonable probability of a different outcome, the Petition does not address Deputy Popick's account.

Petitioner does address Deputy Popick's account in reply to Respondent's response, but, interestingly, only to minimize the probative value of that account by arguing that Respondent's focus on it is "misplaced" because "Deputy Popick only witnessed the acts immediately before the shooting and the shooting itself."  ECF No. [8] at 4.  As an example, Petitioner emphasizes that Deputy Popick did not witness "when the cars were speeding up and getting in front of each other."  *Id.*  In contrast to Deputy Popick's purportedly unhelpful account, Petitioner points to testimony provided by another one of the State's witnesses, Brandon Burton ("Burton").  *Id.* (citing ECF No. [5-1] at 390-91).  Importantly, however, Petitioner's passing reference to Burton's testimony—which in its entirety indicates that Burton testified that Bellamy "had

'gunned' his car to move ahead of the Petitioner and then slow[ed] down in front of him[,]" *id.*

(citing ECF No. [5-1] at 395)—is both incomplete and misleading.

The entirety of Burton's testimony, like Deputy Popick's testimony, paints a starkly different picture than that created by Jayska's testimony and further undercuts the claim that Petitioner was acting in self defense at the time of the shooting. The testimony offered by Burton on direct examination, in relevant part, is as follows:

Q     When you guys get back into the car, do you ever make it out of the parking lot?
A     Yes.
Q     And where do you go, what happens at that point?
A     Well, when we got out of the parking lot, we was heading towards to go home, or whatever. And as we was traveling, we saw a black SUV pass us on the right-hand side, like off the road to like a grass area and it goes around. And then after that, a couple of seconds later, a black Monte Carlo comes around the left-hand lane and passes us, kind of swerves down and hits the brakes.
Q     Is that car, is Mr. Bellamy the car that was driving in, was taking evasive action when the Monte Carlo pulled in?
. . . .
A     Yes.
Q     When the Monte Carlo pulled in front of you, were you guys driving down the street or in a stopped position?
A     Driving down the street.
. . . .
Q     What happens after the Monte Carlo pulled up in front of Mr. Bellamy's vehicle?
A     We then go around him.
Q     What happens at that point?
A     Then he came around us. He came back around us. And he then started firing shots at the car.
Q     When he comes back around the second time, this Monte Carlo, what was the location of your vehicle – the vehicle that you were driving in, what lane were you in?
A     We was in the right-hand lane.
. . . .
Q     All right. The lane that you guys were in, were you headed in the appropriate lane of direction of travel?
A     Yes.
Q     The lane that the Monte Carlo was in, is that in the opposite lane?
A     Yes.

ECF No. [5-1] at 390-93.  The testimony offered by Burton on cross-examination, in relevant

part, is as follows:

> Q      [Y]ou stated that Mr. Lopez was driving a black Monte Carlo who then
> passed you on the left-hand side?
> A      Yes.
> Q      Now, he was in front of the green Buick when he passed you; correct?
> A      When he passed us, he cut us off.
> Q      He's in front of your car; correct?
> A      Correct.
> . . . .
> Q      Okay. Now, with all being equal, Mr. Lopez would then have a clear shot
> to North Bryan Road?
> A      Yes, he'd have a clear shot.
> Q      Except that Mr. Bellamy then gunned his engine and cut back around in
> front of him again; correct?
> A      Yes. It was because he slowed down in front of him.
> Q      So they were playing some games, games are being played; correct?
> A      I don't recall games being played. . . . Someone cutting you off is not a
> game.
> . . . .
> Q      Now, when Mr. Bellamy was planning to overtake the Monte Carlo once
> more, did he make any comments?
> A      No.
> Q      He just went ahead and did it?
> A      Yes.
> . . . .
> Q      And isn't it true that Mr. Bellamy then stepped hard on his brakes?
> A      I don't recall him stepping hard on his brakes.
> Q      Didn't you feel the car slow down?
> A      Well, he kind of slowed down a little.
> Q      He kind of slowed down. And then what happened after that?
> A      And then that's when the Monte Carlo came around the opposite side of
> the road and then started – let lose [sic] with shots at the car.

*Id.* at 410-13.  As evident from Burton's testimony, *both* Petitioner and Bellamy were engaging

in provocative and reckless behavior with their vehicles just before the shooting occurred.

Petitioner recognizes as much.  *See* ECF No. [8] at 4 ("[T]he cars were speeding up and getting

in front of each other.").  The Court rejects that this sequence of events, coupled with Bellamy's

earlier behavior,  supports a defense of self defense.  In reality, the specific conduct exhibited by

Bellamy, that any presented theory of self defense would necessarily have had to rely on, is the very same conduct Petitioner himself exhibited. As such, it is highly unlikely that the jury would have found convincing a defense of self defense if it had been presented.

Although Petitioner need not demonstrate that any deficient performance on the part of defense counsel more likely than not altered the outcome in the case, *see Strickland*, 466 U.S. at 694, he must demonstrate a "reasonable probability" of a different outcome, which requires "a *substantial, not just conceivable*, likelihood of a different result." *Cullen*, 563 at 189 (emphasis added). As illustrated above, Petitioner is unable to meet that burden here. Thus, the Court concludes that the post-conviction court's denial of Petitioner's ineffective assistance of counsel claim based on Ground One, and the appellate court's decision affirming that denial, were neither contrary to nor unreasonable applications of clearly established federal law. Accordingly, the Court denies Petitioner's ineffective assistance of counsel claim based on Ground One.

### B. Ground Two

In Ground Two, Petitioner groups together three claims of ineffective assistance of counsel and argues that their cumulative effect rises to the level of *Strickland* prejudice. ECF No. [1] at 25-29. First, Petitioner alleges that defense counsel failed to conduct any meaningful voir dire, pointing out in particular defense counsel's "fail[ure] to question two jurors about their negative experiences with firearms" and "fail[ure] to question the jurors as to their ability to consider the insanity defense or self defense." *Id.* at 26. Second, Petitioner takes issue with the fact that defense counsel, during the trial, advised the trial court of his intention to pursue both an insanity defense as well as a diminished capacity defense—which, as the trial court informed defense counsel, is not a valid defense in Florida. *Id.* (citing *Chestnut v. State*, 538

So. 2d 820 (Fla. 1989)). According to Petitioner, defense counsel's "reliance on an unavailable defense further compromised his ability to make a reasonable choice with respect to the defense at trial." *Id.* Third, Petitioner raises essentially the same claim presented in Ground One, arguing that defense counsel was deficient in "openly disavow[ing] self defense to the jury and, instead, present[ing] an insanity defense." *Id.* at 26-27.

"The cumulative error doctrine provides that an aggregation of nonreversible errors . . . can yield a denial of the constitutional right to a fair trial, which calls for reversal." *Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012) (quoting *United States v. Baker*, 432 F.3d 1189, 1223 (11th Cir. 2005)); *see also United States v. Vasquez*, 225 F. App'x 831, 836 (11th Cir. 2007) ("[T]he cumulative effect of several errors that are harmless by themselves could so prejudice the defendant's right to a fair trial that a new trial might be necessary.") (quoting *United States v. Preciado–Cordobas*, 981 F.2d 1206, 1215 n. 8 (11th Cir. 1993)). Where there is no error or only a single error, however, there can be no cumulative error. *See United States v. Waldon*, 363 F.3d 1103, 1110 (11th Cir. 2004). Claims of cumulative error are properly addressed by "first considering the validity of each claim individually, and then examining any errors that [are found] in the aggregate and in light of the trial as a whole to determine whether the appellant was afforded a fundamentally fair trial." *Morris*, 677 F.3d at 1132.[6]

---

[6] It is worth noting the uncertainty as to whether the cumulative error doctrine necessarily applies in this context at all. *See Morris*, 677 F.3d at 1132 n. 3 ("We need not determine today whether, under the current state of Supreme Court precedent, cumulative error claims reviewed through the lens of AEDPA can ever succeed in showing that the state court's decision on the merits was contrary to or an unreasonable application of clearly established law."); *Hill v. Sec'y, Dep't of Corr.*, 578 F. App'x 805, 810 (11th Cir. 2014) ("In a previous case, we analyzed a cumulative error claim by assuming without deciding that such a clam in the context of ineffective assistance of counsel would be cognizable in the habeas context, and we affirmed the denial of the claim on the merits. . . . As in *Morris*, we need not decide the issue here because, even assuming a claim of cumulative error is cognizable in federal habeas proceedings, Hill would not be able to satisfy that standard.") (citing *Morris*, 677 F.3d at 1132 n. 3).

As a preliminary matter, for purposes of determining *Strickland* prejudice, Petitioner's second and third claimed errors in Ground Two essentially constitute one claim of error, as they ultimately take issue with defense counsel's choice of defense at trial. In turn, they amount to the same ineffective assistance of counsel claim raised in Ground One. *Compare, e.g.,* ECF No. [8] at 2 ("Ground One . . . . [and] Ground Two . . . . both focus on counsel's deficient performance in his choice of defense . . . ."), *and id.* at 12 (arguing that, for purposes of Ground Two, "*Strickland* prejudice was established here because the end result was that no viable defense was presented to the jury for their consideration when a defense of self defense was strong in this case"), *with* ECF No. [1] at 24 (arguing that, for purposes of Ground One, "[b]y presenting a[n] [insanity] defense that was not viable and affirmatively disavowing a defense amply supported by the record, counsel ensured that no defense would work") (emphasis omitted). And, as previously discussed, irrespective of whether defense counsel's choice of defense constituted deficient performance under the Sixth Amendment, no *Strickland* prejudice resulted from defense counsel having not presented the defense of self defense to the jury. That finding is also dispositive in this context, because Petitioner makes no clear argument in his Petition as to what prejudice, if any, resulted from defense counsel's alleged failure to conduct meaningful voir dire. Petitioner does not actually argue, for example, that a biased juror was seated or that the jury as a whole was in any way biased or unfair. *See* ECF No. [1] at 26. Indeed, although Petitioner asserts "*cumulative* prejudicial impact" under Ground Two, *id.* at 29 (emphasis added), the *only* prejudice for purposes of Ground Two ever identified by Petitioner is the presentation of an allegedly flawed defense of insanity over a purportedly strong defense of self defense, *see id.* at 27-29; ECF No. [8] at 12.

Turning to the merits, the Court is not convinced that the post-conviction court's denial of Petitioner's ineffective assistance of counsel claim based in part on defense counsel's alleged failure to conduct meaningful voir dire, and the appellate court's decision affirming that denial, were contrary to or unreasonable applications of clearly established federal law.[7] As mentioned, in denying Petitioner relief on this ineffective assistance of counsel claim, the post-conviction court adopted the reasoning set forth in the State's response brief. *See* ECF No. [1-2] at 81-87. In its response brief, the State correctly observed that Petitioner was required to show actual bias on the part of the two jurors named by Petitioner. *Id.* at 85-86; *see Fennell v. Sec'y, Dep't of Corr.*, 582 F. App'x 828, 832 (11th Cir. 2014) (explaining that in the postconviction context in Florida, "[w]here a postconviction motion alleges that trial counsel was ineffective for failing to raise or preserve a cause challenge, the defendant must demonstrate that a juror was *actually biased*") (citation omitted) (emphasis in original). Pertinent here, the State argued in its response brief that Petitioner had "not established any bias or prejudice on the part of the named jurors or that each was unable to render a verdict based on the instructions given by the Court." ECF No. [1-2] at 86. The Court agrees. "To meet the actual bias standard, the defendant must demonstrate that the juror in question was not impartial—i.e., that the juror was biased against the defendant, and the evidence of bias must be plain on the face of the record." *Fennell*, 582 F. App'x at 832 (internal quotation marks and citation omitted). Petitioner here does not claim any actual bias against him on the part of the named jurors, and the Court does not find any basis in the record for such a claim. Furthermore, the Court notes that the trial court instructed the jury that the case "must not be decided for or against anyone because you feel sorry for anyone or

---

[7] Without such a finding, Petitioner is unable to establish the occurrence of at least two errors (even assuming that defense counsel's choice of defense at trial constituted error), which precludes his cumulative error claim altogether. *See Waldon*, 363 F.3d at 1110; *see also Evans v. Jones*, 2016 WL 8669873, at *24 (N.D. Fla. Nov. 21, 2016) ("[C]umulative effect analysis should evaluate only matters determined to be in error, not the cumulative effect of non-errors.") (collecting cases).

are angry at anyone" and that its verdict "must be based on the evidence and on the law . . . ." ECF No. [5-1] at 1079-80. In addition, the named jurors, along with the other empaneled jurors, took an oath to be fair and impartial. "Jurors are presumed to follow the law as instructed by the trial court and to comply with their oaths." *Fennell*, 582 F. App'x at 834 (citing *Hallford v. Culliver*, 459 F.3d 1193, 1204 (11th Cir. 2006); *United States v. Khoury*, 901 F.2d 948, 955 (11th Cir. 1990), *modified on other grounds*, 910 F.2d 713 (11th Cir. 1990)). Without any argument, let alone evidence, that the named jurors were actually biased, the Court "must presume that [they] followed the trial court's instructions, set aside [any] feelings of sympathy, and [were] fair and impartial during deliberations." *Id.*

In sum, Petitioner's cumulative error claim fails because the two individual claims of error it is based on do not establish any prejudice, let alone sufficient cumulative prejudice to call into question whether Petitioner was afforded his constitutional right to a fair trial. *See generally United States v. Baker*, 432 F.3d 1189, 1223 (11th Cir. 2005), *abrogated on other grounds by Davis v. Washington*, 547 U.S. 813, 821 (2006) (explaining that under the cumulative error doctrine, the "cumulative prejudicial effect of many errors may be greater than the sum of the prejudice caused by each individual error" in a manner that denies a defendant of a fair trial). Petitioner's cumulative error claim also fails because the additional claim of error it necessarily relies on—namely, defense counsel's alleged failure to conduct meaningful voir dire—was not shown to have constituted error in the first place. Accordingly, the Court denies Petitioner's ineffective assistance of counsel claim based on Ground Two.

### C. Ground Three

Petitioner claims that he was deprived of his Fifth Amendment right to due process when the trial court allowed Bellamy to display the scars left from the gunshot wounds he sustained to the jury, in person.[8]  ECF No. [1] at 29-30.  Specifically, Petitioner argues that Bellamy's injuries were not at issue and were inadmissible because Petitioner presented an affirmative defense and the State did not charge great bodily harm in the information.  *Id.*  Moreover, Petitioner contends, "[t]here was no question that the victim was injured[,]" and "the evidence inflamed the jury's sensibilities and urged the jurors to decide the case based on sympathy for the victim."  *Id.* at 30.

The admission of evidence is a state law matter and state law matters generally do not serve as grounds for federal habeas relief.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law.").  Thus, "[e]videntiary errors . . . are not the subject of federal habeas corpus relief unless violative of federal constitutional standards."  *Jones v. Kemp*, 794 F. 2d 1536, 1541 (11th Cir. 1986) (citing *Hall v. Wainwright*, 733 F. 2d 766, 770 (11th Cir. 1984)).  State court evidentiary rulings are reviewed on a petition for habeas corpus to determine only "whether the error, if any, was of such magnitude as to deny petitioner his right to a fair trial."  *Futch v. Dugger*, 874 F.2d 1483, 1487 (11th Cir. 1989).  "The evidence must be so inflammatory or gruesome, and so critical that its introduction denied petitioner a fundamentally fair trial."  *Id.*  To constitute a violation of a defendant's due process rights, the admitted evidence "must have been not only erroneously admitted at trial, but also must be material in the

---

[8] This issue was presented to the appellate court on direct appeal from the conviction, and the appellate court affirmed without comment.

sense of a crucial, critical, highly significant factor in the conviction." *Williams v. Kemp*, 846 F.2d 1276, 1281 (11th Cir. 1988) (internal quotation marks and citation omitted).

In the Court's view, the evidence at issue here—irrespective of whether its admission at trial was proper—was not inflammatory or gruesome, nor was it a crucial, critical, highly significant factor in the conviction. *See Futch*, 874 F.2d at 1487; *Williams*, 846 F.2d at 1281. Before allowing Bellamy's scars to be shown to the jury, the trial court judge noted that such a showing "will not be bloody, gory" and remarked that he would only allow Bellamy to "show the two places where the bullets went in." ECF No. [5-1] at 322. The trial court judge further explained: "[T]he court has viewed the defendant's leg and what the marks look like, and it is a darkened portion, round portion about the size of a quarter. Three different ones." *Id.* at 338. Additionally, the trauma doctor who treated Bellamy on the night of the incident testified that he treated four gunshot wounds on Bellamy (two on each leg), *id.* at 379-80, which undercuts any claim that the display of Bellamy's scars was material with respect to the conviction, *see, e.g.*, *Erickson v. State*, 565 So. 2d 328, 334 (Fla. 4th DCA 1990) ("It is well settled that even incorrectly admitted evidence is deemed harmless and may not be grounds for reversal when it is essentially the same as or merely corroborative of other properly considered testimony at trial.").

For these reasons, the Court concludes that the appellate court's denial of this claim was not contrary to, or an unreasonable application of, clearly established federal law. Accordingly, the Court denies Petitioner's due process claim under Ground Three.

### IV.   CONCLUSION

For all of the reasons stated herein, Petitioner has not established that he is entitled to federal habeas relief.  Accordingly, it is **ORDERED AND ADJUDGED** that the Petition, **ECF No. [1]**, is **DENIED.** The Clerk shall **CLOSE** the case.

**DONE AND ORDERED** in Miami, Florida, this 27th day of April, 2017.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record